**IN THE CIRCUIT COURT OF THE STATE OF OREGON**

**FOR THE COUNTY OF MULTNOMAH**

| | |
|---|---|
| **MARIIA KONFEKTOVA**, a Citizen of Russia,<br><br>Plaintiff,<br><br>v.<br><br>**CIRQUE DU SOLEIL CANADA INC.**, a Canadian Corporation; **CDS CANADIAN HOLDINGS, INC.**, a Canadian Corporation; **SPECTACLE BIDCO HOLDINGS INC.**, a Canadian Corporation; **CIRQUE DU SOLEIL INC.**, a Canadian Corporation; and **CIRQUE DU SOLEIL NEVADA NEWCO, INC.**, a Delaware Corporation;<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>Personal Injury – Negligence – Employers' Liability Law – Negligence *Per Se* (Oregon Safe Employment Act)<br><br>Filing Fees Based Upon ORS 21.160(1)(e)<br>Amount in Controversy: $16,750,000.00<br><br>(Demand for Jury Trial)<br>(Not Subject to Mandatory Arbitration) |

Plaintiff alleges:

**COUNT ONE**
**(Negligence)**

1.

At all material times hereto:

a) Defendant Cirque du Soleil Canada Inc. was a duly organized Canadian corporation, with a principal place of business located at 8400 Avenue Cirque, city of Montreal, province of Québec, country of Canada, authorized to do business and doing business as a presenter of various touring shows that tour the world year-long;



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

b) Defendant Cirque du Soleil Canada Inc. is a member of the Cirque du Soleil Entertainment Group, headquartered in the city of Montreal, province of Québec, country of Canada, as an international circus-type live entertainment company which was founded in 1984;

c) Defendant Cirque du Soleil Canada Inc. is a subsidiary of defendant CDS Canadian Holdings, Inc.;

d) Defendant CDS Canadian Holdings, Inc. was a duly organized Canadian corporation, with a principal place of business located at 8400 Avenue Cirque, city of Montreal, province of Québec, country of Canada, authorized to do business and doing business as a presenter of various touring shows that tour the world year-long;

e) Defendant CDS Canadian Holdings, Inc. is a member of the Cirque du Soleil Entertainment Group, and is a subsidiary of defendant Spectacle BidCo Holdings Inc., a duly organized Canadian corporation;

f) Defendant Spectacle BidCo Holdings Inc. was a duly organized Canadian corporation, with a principal place of business located at 8400 Avenue Cirque, city of Montreal, province of Québec, country of Canada, authorized to do business and doing business as a presenter of various touring shows that tour the world year-long;

g) Defendant Spectacle BidCo Holdings Inc. is the parent entity of the Cirque du Soleil Entertainment Group;

h) Defendant Cirque du Soleil Inc. was a duly organized Canadian corporation, with a principal place of business located at 8400 Avenue Cirque, city of Montreal, province of Québec, country of Canada, authorized to do business and doing business as a presenter of various touring shows that tour the world year-long;

i) Defendant Cirque du Soleil Inc. is a member of the Cirque du Soleil Entertainment Group, and is a subsidiary of defendant Cirque du Soleil Canada, Inc.;

j) Defendant Cirque du Soleil Nevada Newco, Inc. was a duly organized Delaware corporation, with a principal place of business located at 112 N. Curry Street, city of Carson City, state of Nevada, authorized to do business and doing business as a presenter of various touring shows that tour the United States throughout the year;

k) Defendant Cirque du Soleil Nevada Newco, Inc. is a member of the Cirque du Soleil family of entertainment companies;

l) Defendants Cirque du Soleil Canada Inc., CDS Canadian Holdings, Inc., Spectacle BidCo Holdings Inc., Cirque du Soleil Inc., and Cirque du Soleil Nevada Newco, Inc., shall be referred to collectively hereinafter as the "CIRQUE DU SOLEIL DEFENDANTS";



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

m) Plaintiff Mariia Konfektova ('KONFEKTOVA" or "PLAINTIFF) was and is now a citizen of Russia, was an employee of one, but only one, of the Cirque du Soleil defendants, and is now a temporary resident of China.

2.

Cirque du Soleil was founded by a troupe of street performers in 1982, who first started their circus work in the city of Baie-Saint-Paul, province of Québec, country of Canada. The Cirque du Soleil founders made a name for themselves "by offering a travelling show with a unique take on the circus arts, notably by creating a captivating environment where outrageous costumes, magical lighting, and original music, were showcased, the whole without the presence of any live animal onstage."

3.

Since the beginning, the Cirque du Soleil defendants have had a notable presence in the circus arts industry, which resulted in an increased international presence. The Cirque du Soleil defendants now present various touring shows that tour the world year-long, and have developed relationships with various international partners for the creation of year-long resident shows, the most notable ones being located in the city of Las Vegas, county of Clark, state of Nevada. Cirque du Soleil has approximately three-thousand-three-hundred (3,300) employees worldwide.

4.

Plaintiff had approximately eight (8) years of experience as an aerial hoop artist prior to being employed by one, but only one, of the Cirque du Soleil defendants in March of 2024. Before working with Cirque du Soleil, plaintiff Konfektova was an experienced aerialist, she was awarded the bronze lion at the highly regarded Wuqiao circus festival, and Guinness World Record holder for the most seated aerial hoop rotations in thirty seconds.

5.

On or about November 20, 2023, plaintiff entered into an "Artist Employment Agreement" with defendant Cirque du Soleil Inc., whereby plaintiff was hired to perform various artistic and acrobatic acts for a financial remuneration as part of the "KOOZA" show.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

6.

During her equipment phase with the Cirque du Soleil defendants, which lasted from approximately November 2023, to March 2024, plaintiff provided detailed specifications for the aerial hoop she would be working with, including maximum outer diameter requirements and requested a weight of approximately eight kilograms (8 kg), or seventeen-and-six-tenths pounds (17.6 lbs).

7.

Email communications confirmed that the Cirque du Soleil defendants understood and acknowledged plaintiff's requested hoop specifications.

8.

Prior to plaintiff's arrival to commence work as an aerialist for Spectacle BidCo Holdings Inc., the Cirque du Soleil defendants and plaintiff discussed and confirmed the specifications for the aerial hoop plaintiff would use for the production. Plaintiff initially indicated that the hoop weight could range from approximately six-and-a-half (6.5) kilograms to ten (10) kilograms, but subsequently clarified that approximately eight (8) kilograms would be ideal for her. The Cirque du Soleil defendants acknowledged and confirmed the eight-kilogram specification. Plaintiff also provided size specifications, explaining that an internal diameter of approximately ninety-five centimeters (95 cm) and an outer diameter of approximately one hundred centimeters (100 cm) worked best for her, with an outer diameter of one hundred centimeters (100 cm) representing the maximum size she had specified. The defendants subsequently informed plaintiff that the hoop they had ordered would weigh approximately five-and-one-tenth kilograms (5.1 kg), substantially less than the approximately eight kilograms (8 kg) that had been agreed upon.

9.

Upon plaintiff's arrival at the Montréal Headquarters, the Cirque du Soleil defendants presented her with two hoop options: one measuring approximately thirty-seven-inches (37") in internal diameter and another measuring approximately thirty-eight-inches (38") in internal diameter. The 38-inch hoop, with a 27 mm pipe diameter, had an outer diameter of approximately 101.9 cm



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

and therefore exceeded plaintiff's specified maximum outer diameter of one-hundred-centimeters (100 cm). The thirty-seven-inch (37") hoop had an internal diameter of approximately 94 cm and, with a 27 mm pipe diameter, an outer diameter of approximately 99.4 cm, and therefore remained within plaintiff's specified maximum outer diameter. The 37-inch (37") hoop weighed approximately 5.1 kg, substantially less than the approximately eight kilograms (8 kg) that had been agreed upon.

10.

Because the 38-inch (38") hoop exceeded plaintiff's specified maximum outer diameter of 100 cm, plaintiff chose the 37-inch (37") hoop (hereinafter referred to as the "AERIAL HOOP"), which remained within her specified size limitation, despite its substantially lower weight. Plaintiff did not agree to a hoop exceeding the specified maximum outer diameter of one-hundred-centimeters (100 cm). Plaintiff had also raised concerns regarding rope quality with the Cirque du Soleil defendants from the early stages of the relationship.

11.

On August 24, 2024, plaintiff was performing in the touring Cirque du Soleil production entitled "KOOZA" at the Portland Expo Center site, located at 2060 N. Marine Drive, city of Portland, county of Multnomah, state of Oregon (the "PRODUCTION"). Plaintiff was working at the Cirque du Soleil Production as an aerialist on the Aerial Hoop, acting within the course and scope of her employment by one, but not more than one, of the Cirque du Soleil defendants.



*Figure 1: Plaintiff Konfektova on the Aerial Hoop.*



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

12.

Plaintiff arrived in Portland, Oregon on or about August 16, 2024, for her first day of stage training. The rigging system required to perform the aerial hoop act is constructed each time the show moved locations. When plaintiff saw the rigging system for the Portland shows she immediately noticed the winch was installed approximately two-feet (2') off center. This discrepancy affected plaintiff's spatial awareness and ability to perform her act. Plaintiff reported the discrepancy to the Cirque du Soleil defendants' coach and the head of rigging.

13.

Plaintiff was informed that the Cirque du Soleil defendants could not, or would not, re-position the winch despite her concerns. Plaintiff felt pressure to perform regardless.

14.

During her act on August 24, 2024, plaintiff was elevated approximately fifteen feet (15') above a circular stage. There was no safety mat or net placed below her. There was no positioning device or any other form of personal fall protection provided by the Cirque du Soleil defendants for plaintiff Konfektova to use during her performance.

15.

During the KOOZA production on August 24, 2024, plaintiff had one rope and one aerial hoop, which weighed just over five kilograms (5.1 kg.) and measured about thirty-seven inches (37") in diameter ("AERIAL HOOP").

16.

At approximately 7:27 p.m., plaintiff was performing the aerial hoop act ("AERIAL HOOP ACT") which required her to transition movements on and around the Aerial Hoop. As plaintiff was transitioning movements, her right foot suddenly slipped from the bottom of the hoop while her left foot was wrapped around the rope above the top of the hoop. Plaintiff's hands were touching the hoop for stability, but she lost grip and fell fifteen feet (15') onto the stage below her, with no safety mat, safety net, or other form of fall protection, to brace her fall.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

17.

Emergency responders arrived ten to fifteen (10-15) minutes after the fall. Plaintiff Konfektova was transported to Legacy Emanuel Medical Center ("LEMC") in the city of Portland, county of Multnomah, state of Oregon. Plaintiff was admitted for surgery to treat multiple facial and wrist fractures.

18.

Daniel Dunlop, an employee of one of the Cirque du Soleil defendants, called the Occupational Safety and Health Administration of the state of Oregon ("OR-OSHA" or "OREGON OSHA") to report the incident at approximately 4:07 p.m. on August 25, 2024, the day after the fall.

19.

In materials provided to Oregon OSHA, the Cirque du Soleil defendants stated that their internal standard set twenty feet (20'), measured from the highest point of the body, as the threshold at which fall protection or other safety precautions became mandatory, including belts, safety mats, safety nets, or fall arrest systems. The Cirque du Soleil defendants picked twenty feet (20') as their height requiring safety devices as it aligned with an industry reference from the New York State Senate, Arts and Cultural Affairs (ACA) Chapter 11-C, Title M, Article 37.09.

20.

The Cirque du Soleil defendants further stated that a safety net or safety mat was not used during plaintiff Konfektova's act because of the groundwork and full stage travel. Cirque also acknowledged that fixing plaintiff Konfektova to her equipment would have limited or prevented her acrobatics and/or shortened the time of her performance.

21.

Moreover, the Cirque du Soleil defendants' "Human Performance Design Risk Management Checklist," dated June 27-28, 2024, and signed by Head Coach Cherie Walker, confirms that the Cirque du Soleil defendants had considered implementing a safety system to attenuate the force of landing for the Aerial Hoop Act. Under the "Technical Readiness and



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

Equipment" section, "Action 6" stated that "Implementation of safety system to attenuate force of landing has been considered," yet Cirque marked the item "NA" with the notation, "Not possible/relevant for show/act design."

22.

The Cirque du Soleil defendants' prior risk documentation for the Aerial Hoop Act identified "Fall from 15 to 30 feet" as a hazard, assigned it an initial risk rating of "Undesirable," and classified the severity of that risk as "Catastrophic," with a probability of "Unlikely."

23.

By contrast, the Cirque du Soleil defendants used fall-protection measures for other elevated KOOZA acts, including safety nets for High Wire acts, mats and nets for the Wheel of Death, an acrobatic longe ("lunge line"), which acts as a high-altitude fall arrest system when hand-balancing on chairs, and fly mats for Teeterboard landings.

24.

The Cirque du Soleil defendants did not possess industry or formal American National Standards Institute ("ANSI") fall protection courses for performers. The Cirque du Soleil defendants stated that performers, including aerialists, do not receive general industry fall protection training because they do not use conventional work-at-height Personal Protective Equipment ("PPE") or fall arrest systems during performances. The Cirque du Soleil defendants further stated that its formal American National Standards Institute ("ANSI")-certified fall protection programs are offered to technicians, but not to performers.

25.

Plaintiff began training with the Cirque du Soleil defendants on or around April 22, 2024. Plaintiff Konfektova had less than six (6) months of tenure with the KOOZA show at Cirque du Soleil at the time of the incident. Plaintiff Konfektova trained and helped design the act over four to five (4–5) weeks at the headquarters of the Cirque du Soleil defendants in Canada.

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

26.

After the training in Canada, plaintiff Konfektova continued training for six (6) weeks as part of her integration into the KOOZA show, performing her first live show on July 3, 2024.

27.

During her training, plaintiff Konfektova practiced stage rehearsals and strength and conditioning for about eight (8) hours per day.

28.

Plaintiff received training on rescue procedures for her specific act, such as how to signal to stop the act if there were concerns and an emergency plan to render first aid.

29.

Plaintiff Konfektova never received training on fall protection measures or fall arrest systems from the Cirque du Soleil defendants. Although she had previously practiced "landing from a fall" through prior experience, the Cirque du Soleil defendants provided no formal training to protect her from the specific fall risks created by its own production.

30.

Oregon OSHA and other public outlets reported multiple prior fall-related injuries, including numerous fatalities, involving performers falling from apparatuses during shows or training sessions of the Cirque du Soleil defendants. Incidents include:

a) An April 2006 incident in Las Vegas, Nevada, when a performer fell approximately twenty (20) feet during a rehearsal of the Zumanity aerial act suffering multiple serious injuries and requiring surgeries;

b) A November 15, 2007, incident in Las Vegas, Nevada, involving two (2) performers who fell approximately fifteen (15) to thirty-five (35) feet during an aerial-silk duet. The aerial-silk act was subsequently suspended for a safety review;

c) A December 20, 2007, incident involving two performers suffering injuries when one performed fell approximately forty (40) feet during a Saltimbanco performance in Montreal, Canada. The performer's fall was broken by the show's ringmaster who suffered a fractured femur and ankle;



PICKETT DUMMIGAN WEINGART LLP
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

d) An October 16, 2009, fatality when a performer died from head injuries suffered during a training session involving a Russian Swing in Montreal, Canada. A subsequent occupational-safety investigation found that Cirque du Soleil failed to adequately determine the risks associated with the equipment;

e) A June 26, 2013, incident in Las Vegas, Nevada, when during a preview performance an acrobat performing the "Stranger in Moscow" scene slipped through a slack rope and fell onto the stage, missing a protective pad and suffering a severe concussion;

f) A June 30, 2013, fatality in Las Vegas, Nevada, in which a performer fell approximately ninety-four feet (94') when a supporting wire rope was cut during a live trapeze performance;

g) A November 1, 2013, incident in Las Vegas, Nevada, when a performer in the Wheel of Death act slipped and fell from the apparatus during a performance. The Cirque du Soleil defendants temporarily removed the Wheel of Death act from the production and replaced it with an aerial-straps act while the performer recovered;

h) An October 20, 2016, incident in Orlando, Florida, wherein a performer fell approximately thirty (30) to forty (40) feet from an aerial silk during rehearsal, suffering serious injuries which required multiple surgeries and rehabilitation. OSHA investigated the incident;

i) A November 27, 2016, incident in Brisbane, Australia, where a former Australian Olympic gymnast fell approximately ten (10) to fifteen (15) feet during her solo aerial hoop performance in the KOOZA show. The performer fell on her head, lost consciousness, and was transported to the hospital. Her injuries included a C1 cervical fracture and a broken arm;

j) A March 30, 2017, incident in Redmond, Washington, when a performer fell while attempting a swing-to-swing transfer, landing on her back;

k) A March 18, 2018, fatality in Tampa, Florida, when a performer fell approximately twenty feet (20') after slipping from aerial straps above the audience;

l) A January 5, 2020, hospitalization in Las Vegas, Nevada, when a performer fell approximately fifteen feet (15') during the Russian Swing act and sustained multiple fractures and organ injuries;

m) A February 16, 2020, incident in Las Vegas, Nevada when an aerial performer fell during the finale of the Beatles, LOVE show and was hospitalized for arm, back, and internal injuries;

n) An October 20, 2021, hospitalization in Orlando, Florida, when a performer practicing a swing-to-swing act fell approximately ten feet (10') to an unprotected stage area and suffered a lumbar fracture, which prompted a Hazard Alert Letter recommending additional stage protection and mats;



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

o) A June 2023 incident in Las Vegas, Nevada, where a performer back-dived from a floating set piece into water approximately three-feet-eight-inches (3'8") deep due to the set's position, resulting in spinal injuries and OSHA findings that there was no cue to ensure the dive occurred over sufficiently deep water.

31.

A prior OSHA correspondence issued on April 5, 2022, urged the Cirque du Soleil defendants to add fall-protection measures such as mats around performance areas.

32.

The Cirque du Soleil defendants, acting independently and/or through their employees, failed to exercise reasonable care to prevent foreseeable harm to performers in the production in general, and to plaintiff in particular, in one or more of the following respects:

a) In failing to require that performers in general, and plaintiff Konfektova in particular, use fall protection when performing at an elevated height at or above fifteen (15) feet;

b) In failing to provide training to performers who would be performing at an elevated height on fall protection safety protocols;

c) In failing to adopt feasible fall-attenuation or fall-arrest measures, such as nets, mats, airbags, harnesses, or positioning devices;

d) In failing to implement fall protection or interim protective measures for the Aerial Hoop Act;

e) In failing to heed prior OSHA correspondence urging the addition of fall-protection measures such as mats around performance areas;

f) In failing to provide general industry fall-protection training and to ensure performers were trained on, and equipped with, conventional fall protection where exposed to falls to lower levels of fifteen feet (15') or more;

g) In failing to adequately train and inspect for safe operation and supervise safety relating to the use of fall protection on the production to ensure adequate fall protection was used by all employees at all times when performing at an elevated height at or above fifteen feet (15');

h) In failing to require compliance with a written safety plan on the production with safety requirements for each act, including safety training or specific hazards of failing to use fall protection at all times when performing at an elevated height at or above fifteen feet (15');



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

i) In failing to require that personal fall arrest systems were rigged in such a manner that an employee could neither free-fall more than fifteen feet (15′), nor contact any lower level;

j) In failing to warn employees of the danger of working without adequate personal fall arrest systems, at a time when the Cirque du Soleil defendants knew, or, in the exercise of reasonable care, should have known, of the reasonably foreseeable and unreasonably dangerous hazard presented by lack of adequate fall protection when performing at an elevated height at or above fifteen feet (15');

k) In failing to ensure that a written program was in effect to provide for violations, warnings, and discipline, for employees of the Cirque du Soleil defendants that failed to comply with basic fall protection safety principles;

l) In failing to warn performers in general, and plaintiff in particular, of the danger of performing the Aerial Hoop Act approximately fifteen feet (15') above the stage without a safety net, safety mat, positioning device, or other personal fall protection, at a time when the Cirque du Soleil defendants knew, or in the exercise of reasonable care should have known, of the reasonably foreseeable and unreasonably dangerous fall hazard presented by requiring such elevated performance without fall protection;

33.

The fault and/or negligence of the Cirque du Soleil defendants, in one or more of the particulars set forth herein, was a substantial factor in causing, contributing to, enhancing, and/or aggravating the following injuries to plaintiff Mariia Konfektova:

a) LeFort III facial fracture;

b) Left zygomaticomaxillary complex fracture ("ZMC");

c) Left orbital floor fracture with depressed component;

d) Right mandibular condylar head fracture with medial displacement;

e) Left mandibular parasymphysis fracture;

f) Bilateral nasal bone fractures;

g) Bilateral pterygoid plate fractures;

h) Extensive facial soft-tissue emphysema from right maxillary sinus (soft tissue gas) and facial swelling/contusions;

i) Traumatic epistaxis;



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

j) Through-and-through lower lip laceration involving vermilion border;

k) Concussion/post-concussive syndrome with somatic symptoms;

l) Right scaphoid fracture;

m) Diplopia (double vision) and periorbital ecchymosis affecting visual fields;

n) Mandibular malocclusion/apertognathia;

o) Poor oral intake/acute malnutrition risk during hospitalization;

p) Right ankle pain;

q) Chronic L2 anterior-superior endplate fracture;

Plaintiff reserves the right to amend this Complaint at a later time to more fully describe plaintiff's injuries as deemed necessary, and/or to conform to proof offered at trial.

34.

On account of the aforementioned injuries, plaintiff underwent the following surgical and medical procedures:

a) Open reduction and internal fixation ("ORIF") of left mandibular parasymphysis fracture with one-millimeter (1.0 mm) tension plate (superior, monocortical) and one-and-one-half millimeter (1.5) mm six-(6) hole compression plate (inferior, bicortical);

b) ORIF of bilateral LeFort I components and bilateral zygomaticomaxillary ("ZMC") buttresses (including right ZM L-plate; left ZF curvilinear plate), with infraorbital rim plating on right;

c) Left orbital floor reconstruction with preformed orbital plate/mesh (forty-two millimeters (42 mm) orbital rim plate) via transconjunctival approach;

d) Closed reduction of right mandibular subcondylar/condylar head fracture with postoperative elastic MMF guidance;

e) Emergency department complex laceration repair of through-and-through lower lip involving vermilion border (layered closure with 4-0 Vicryl, 5-0 fast gut, 5-0 chromic);

f) Seven-day inpatient intravenous ("IV") antibiotic prophylaxis for facial fractures (ampicillin-sulbactam/Unasyn);

g) Right scaphoid ORIF with eighteen millimeters (18 mm) headless cannulated compression screw (Synthes);



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

h) Tetanus, diptheria, and acellular pertussis ("TDAP") immunization;

i) Maxillofacial internal fixation implants placed (Synthes/DePuy plates and screws to mandible, midface, orbital rim; left orbital preformed plate).

35.

As a result of the aforementioned injuries, plaintiff has suffered permanent injury and loss of enjoyment of life, and will continue to suffer from pain and loss of enjoyment of life in the future, all to her noneconomic damage in an amount to be determined by the jury to fully and fairly compensate plaintiff for her damages in accordance with Oregon law, but in an amount not to exceed the sum of $15,000,000.00.

36.

As a result of the aforementioned injuries, plaintiff has incurred reasonable and necessary medical, hospital, doctor, therapy, nursing, and rehabilitation expenses to date in the approximate sum of $200,000.00. Plaintiff will incur reasonable and necessary medical, hospital, doctor, therapy, nursing, and vocational rehabilitation expenses in the future, the present value of which is the approximate sum of $150,000.00.

37.

Plaintiff has lost wages and/or loss of earning capacity to date in the approximate sum of $200,000.00, and will incur loss of wages and/or loss of earning capacity in the future, the present value of which is the approximate sum of $1,200,000.00, all to her total economic damage in the approximate sum of $1,750,000.00.

38.

Plaintiff is entitled to interest at 9% per annum for her economically verifiable losses from the date of loss to the date of judgment.

39.

Plaintiff reserves the right to amend this complaint at the time of trial to more completely allege her economic losses and/or to conform to proof offered at trial.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

40.

Following the injuries she suffered on August 24, 2024, and her hospitalization and recovery process thereafter, plaintiff attempted to continue to work. However, the reintegration process took significantly longer than expected.

41.

Rope quality created ongoing technical and physical issues for plaintiff: rope length changing unpredictably, automation difficulties, technical inconsistencies, all contributed to her neck pain and physical discomfort. The technical team of the Cirque du Soleil defendants reportedly experienced difficulties and programming automation problems due to rope inconsistency.

42.

Plaintiff continued verbally raising concerns to the Cirque du Soleil defendants regarding: rope, physical discomfort, and the need for proper equipment. Plaintiff requested permission from the Cirque du Soleil defendants to use personal apparatus with documentation. Documentation was submitted to the head of rigging, but after submitting the documentation for her personal apparatus, plaintiff continued following up verbally with the coach regarding whether the request had been reviewed or approved.

43.

Follow-ups occurred repeatedly over the following weeks, as plaintiff continued asking the Cirque du Soleil defendants whether there were any updates regarding the rope replacement request. No clear resolution or implementation timeline was communicated to plaintiff. The request was not implemented but was delayed and unresolved.

///

///

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

44.

Concerns regarding the mental health issues of plaintiff were raised internally by the Cirque du Soleil defendants and she was temporarily restricted from performing aerial work until medical clearance was provided. Plaintiff was also asked to provide a psychiatric/medical certificate confirming fitness to work. During a private discussion with the head physiotherapist of the Cirque du Soleil defendants, plaintiff explained that she did not yet have the requested psychiatric/medical documentation at the time concerns regarding her mental health were raised.

45.

Plaintiff stated that obtaining the required documentation would take time, particularly due to the holiday/Christmas period during 2025, and difficulties accessing medical specialists during that period. Plaintiff was informed by the Cirque du Soleil defendants that she would not be permitted to return to aerial work until the requested medical clearance was provided. She indicated that the process could take several weeks, and this was acknowledged during the discussion with the Cirque du Soleil defendants.

46.

On December 21, 2025, a meeting was held between plaintiff and the artistic director, coach, and head physiotherapist of the Cirque du Soleil defendants. During the meeting, concerns were raised by the Cirque du Soleil defendants regarding plaintiff's mental health and ability to meet the company's expectations.

47.

The coach of the Cirque du Soleil defendants separately stated that, beyond the recent mental health concerns, she believed plaintiff was generally not meeting the company's expectations.

48.

At the time, no specific expectations or performance objectives were clearly identified to plaintiff during the meeting.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

49.

The artistic director of the Cirque du Soleil defendants suggested that plaintiff should consider taking a break from work for mental health reasons. Konfektova stated that she felt she was capable of continuing to work and that she was willing to provide medical documentation confirming her fitness to work.

50.

Plaintiff stated that, if her medical documentation was considered insufficient, she was willing to travel to Canada and undergo evaluation by any doctor designated or approved by the Cirque du Soleil defendants.

51.

Concerns were expressed by plaintiff to the Cirque du Soleil defendants regarding whether her medical documentation would ultimately be accepted.

52.

Plaintiff later asked the coach of the Cirque du Soleil defendants to clarify what specific expectations she believed plaintiff was not meeting. Konfektova was told that the concern related to not performing all of the scheduled shows.

53.

Around that period of December 2025, plaintiff had recently missed performances due to illness (flu symptoms), as well as other absences that had been discussed or recommended by the Cirque du Soleil defendants.

54.

During that same general time period of December 2025, plaintiff raised concerns with the Cirque du Soleil defendants on multiple occasions regarding rope quality and the physical strain plaintiff experienced while working with the apparatus.

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

55.

Plaintiff experienced ongoing neck strain and physical discomfort which, to her understanding, contributed to the difficulties with consistently performing all scheduled shows during that time period in December 2025.

56.

Before her termination, plaintiff became aware through informal conversations that some staff members of the Cirque du Soleil defendants appeared to expect her employment would end. After becoming aware of these informal conversations, Konfektova directly asked the artistic director of the Cirque du Soleil defendants about concerns regarding her employment status.

57.

During that discussion, which was on or around December 27, 2025, plaintiff was told by the Cirque du Soleil defendants that she still had a contract for the next city and that, once medical clearance documentation was provided, she would be able to continue working.

58.

Konfektova was also told by the Cirque du Soleil defendants to "relax" and was reassured that her employment would continue following submission of the requested documentation.

59.

On or around January 16, 2026, plaintiff provided medical documentation confirming her fitness to work to the Cirque du Soleil defendants. That documentation was sent through "Teams" to the Cirque du Soleil defendants' medical professional in Montreal, Canada.

60.

After reviewing the documentation, the company doctor informed plaintiff that everything appeared to be in order and stated that he would inform the Cirque du Soleil defendants accordingly.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

61.

After this exchange, plaintiff did not receive any indication from the Cirque du Soleil defendants that additional documentation or medical evaluation was required. The next communication plaintiff received was an invitation to a meeting with the Cirque du Soleil defendants during which her employment was terminated.

62.

On or around January 19, 2026, plaintiff was invited to a ZOOM meeting with the Cirque du Soleil defendants' company manager, artistic director, and Human Resources ("HR") representative. During the meeting and in the written termination letter, the Cirque du Soleil defendants stated that plaintiff's "reintegration objectives" had not been attained.

63.

In the termination letter the Cirque du Soleil defendants stated that because the "reintegration objectives" had not been attained, this allegedly prevented continuation of the Agreement with plaintiff. The Cirque du Soleil defendants also stated that, for "artistic reasons," the structure of the show had been reviewed and that the Aerial Hoop position would be abolished starting in Singapore.

64.

Plaintiff's employment agreement was officially terminated by the Cirque du Soleil defendants effective January 20, 2026. No clear reintegration objectives had previously been communicated verbally or in writing by the Cirque du Soleil defendants to plaintiff.

65.

Following plaintiff's termination, the performer who had previously occupied her position before Konfektova joined the production, and later returned to perform a substantially similar role.

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

66.

To plaintiff's knowledge, the position and performance functions continued after her termination, including through the return of the performer in the Aerialist position whom Konfektova had originally replaced.

67.

Plaintiff hereby demands a jury trial.

**COUNT TWO**
**(Employers' Liability Law)**
**(Not Based on Safety Codes)**

68.

Plaintiff realleges and incorporates herein ¶¶1 through 67 of Count One.

69.

The type of work in which plaintiff was engaged in at the time of her injury was work that involved risk and danger because she was working in a show that required her to perform an Aerial Hoop Act approximately fifteen feet (15') above stage without a safety net, safety mat, harnesses, or any or adequate forms of personal fall protection.

70.

At all material times herein, the Cirque du Soleil defendants were subject to the Employers' Liability Law (ORS 654.305 to 654.336) ("ELL"), which provided, in part:

> **ORS 654.305** Generally, all **owners**, contractors or subcontractors and **other persons** having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or devise, and without regards to the additional cost of suitable material or safety appliance and devices. (emphasis supplied)

71.

At all material times herein, the Cirque du Soleil defendants were subject to the ELL of the state of Oregon, in that:



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

a) The Cirque du Soleil defendants retained the right to control or direct the manner and method in which the work of plaintiff was performed during the show, while she was working as an aerialist as part of the Production, elevated at a height of fifteen feet (15') with no fall protection;

b) The Cirque du Soleil defendants were in a common enterprise with each other, and with the Portland Expo Center, in presenting a show which required plaintiff to perform as an aerialist without any or adequate fall protection measures.

72.

At all material times, the Cirque du Soleil defendants were direct or indirect employers of plaintiff Konfektova and thus were in charge of and responsible for work involving risk or danger to plaintiff and to other employees working in the Production.

73.

The Cirque du Soleil defendants failed to use every device, care, or precaution that is practical to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine, or other apparatus or device and without regard to additional costs of suitable material or safety appliances or devices, as required by ORS 654.305, in one or more of the particulars set forth in ¶32 above.

74.

As a result of one or more of the violations of the ELL by the Cirque du Soleil defendants as set forth above, plaintiff suffered injuries, underwent medical procedures, and is entitled to compensatory damages on Count Two as set forth in ¶¶33 through 38 of Count One.

**COUNT THREE**
**(Employers' Liability Law)**
**(Based on Safety Codes)**

75.

Plaintiff realleges and incorporates herein ¶¶1 through 67 of Count One, and ¶¶69 through 74 of Count Two.

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

76.

At all material times, there was in full force and effect in the State of Oregon an Employers' Liability Law which provided in pertinent part as follows:

> **ORS 654.310** All **owners**, contractors, subcontractors, or **persons whatsoever**, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure, or in the erection or operation of any machinery, or in the manufacture, transmission and use of electricity, or in the manufacture or **use of any dangerous appliance** or substance, shall see that all places of employment are in compliance with every applicable order, decision, direction, standard, rule or regulation made or prescribed by the Department of Consumer and Business Services pursuant to ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780. (emphasis supplied)

77.

At all material times herein, there were in full force and effect certain safety codes, promulgated by the state of Oregon in the Oregon Revised Statutes ("ORS") and the Oregon Administrative Rules ("OAR"), and by the federal government of the United States in the Code of Federal Regulations ("CFR"). The Cirque du Soleil defendants violated these rules and regulations in one or more of the following particulars:

a) **29 CFR §1910.28 Duty to have fall protection and falling object protection.**

***

(b) Protection from fall hazards—

***

(12) Scaffolds and rope descent systems. The employer must ensure:

(i) Each employee on a scaffold is protected from falling in accordance 29 CFR part 1926, subpart L; and

(ii) Each employee using a rope descent system 4 feet (1.2m) or more above a lower level is protected from falling by a personal fall arrest system.

***



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

> (15) Walking-working surfaces not otherwise addressed. Except as provided elsewhere in this section or by other subparts of this part, the employer must ensure each employee on a walking-working surface 4 feet (1.2 m) or more above a lower level is protected from falling by:
>
> (i) Guardrail systems;
>
> (ii) Safety net systems; or
>
> (iii) Personal fall protection systems, such as personal fall arrest, travel restraint, or positioning systems.

The Cirque du Soleil defendants violated this rule because prior to the injury event that occurred at 2060 N. Marine Drive in Portland, on August 24, 2024, one worker (plaintiff) was exposed to fall hazards when the Cirque du Soleil defendants did not ensure that they were protected from falling, while performing the aerial hoop act at approximately fifteen feet (15') above a lower level. Plaintiff performed aerial work at approximately 15 feet (15') without safety mats, nets, or personal fall arrest, exposing her to a fall hazard without required protection. As a result, Konfektova fell from the Aerial Hoop and suffered serious injuries including, but not limited to, her head, jaw, back, and wrists;

(b) **ORS 654.010 – Employers required to furnish safe and healthful place of employment**

> Every employer shall furnish employment and a place of employment which are safe and healthful for employees therein, and shall furnish and use such devices and safeguards, and shall adopt and use such practices, means, methods, operations and processes as are reasonably necessary to render such employment and place of employment safe and healthful, and shall do every other thing reasonably necessary to protect the life, safety and health of such employees.

The Cirque du Soleil defendants violated the aforementioned safety code by failing to provide a safe place of employment in that their failure to provide adequate fall protection when elevating performers to fifteen feet (15') constituted a safety hazard;

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

c) **OAR 437-001-0760 - Rules for All Workplaces**

(1) Employers' Responsibilities.

a) The employer must see that workers are properly instructed and supervised in the safe operation of any machinery, tools, equipment, process, or practice that they are authorized to use or apply. This rule does not require a supervisor on every part of an operation nor prohibit workers from working alone.

b) The employer must take all reasonable means to require employees:

(A) To work and act in a safe and healthful manner;

(B) To conduct their work in compliance with all applicable safety and health rules;

(C) To use all means and methods, including but not limited to, ladders, scaffolds, guardrails, machine guards, safety belts, and lifelines, that are necessary to safely accomplish all work where employees are exposed to a hazard;

***

(3) Investigations of Injuries

a) Each employer must investigate or cause to be investigated every lost time injury that workers suffer in connection with their employment, to determine the means that should be taken to prevent recurrence. The employer must promptly install any safeguard or take any corrective measure indicated or found advisable.

***

(6) Extraordinary Hazards. When conditions arise that cause unusual or extraordinary hazards to workers, additional means and precautions shall be taken to protect workers or to control hazardous exposure. If the operation cannot be made reasonably safe, regular work must be discontinued while such abnormal conditions exist, or until adequate safety of workers is ensured.

(7) Inspections.

a) All places of employment must be inspected by a qualified person or persons as often as the type of operation or the character of the equipment requires. Defective equipment or unsafe conditions found by these inspections must be replaced or repaired or remedied promptly.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

The Cirque du Soleil defendants violated the aforementioned safety codes because, on the day of the incident, plaintiff Konfektova was performing her work activities without a fall arrest system and without any or adequate safety measures, thereby allowing her to fall approximately fifteen feet (15') to a lower level, and because provisions for safety were not included in performance design, layout and operation including but not limited to fall protection, and/or a fall arrest system;

d) **OAR 437-003-1501 - Fall Protection**

(1) General. Except where permitted by another standard, when employees are exposed to a hazard of falling six feet (6') or more to a lower level, the employer must ensure that fall protection systems are provided, installed, and implemented according to the criteria in 1926.502, 437-003-0502, 437-003-1502, and 437-003-2502.

The Cirque du Soleil defendants violated the aforementioned safety code because on the day of the incident, plaintiff Konfektova was performing her work activity without a fall arrest system, thereby allowing her to fall approximately fifteen feet (15') to a lower level;

e) **29 CFR §1910.22 General requirements.**

***

(d) Inspection, maintenance, and repair. The employer must ensure:

(1) Walking-working surfaces are inspected, regularly and as necessary, and maintained in a safe condition;

(2) Hazardous conditions on walking-working surfaces are corrected or repaired before an employee uses the walking-working surface again. If the correction or repair cannot be made immediately, the hazard must be guarded to prevent employees from using the walking-working surface until the hazard is corrected or repaired; and

(3) When any correction or repair involves the structural integrity of the walking-working surface, a qualified person performs or supervises the correction or repair.

The Cirque du Soleil defendants violated the aforementioned safety codes because on the day of the incident, plaintiff Konfektova was performing her work activity without adequate or any inspections of working surfaces, and in the absence of the correction of hazardous conditions.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

f) **29 CFR §1910.30 – Training requirements.**

(a) Fall hazards.

(1) Before any employee is exposed to a fall hazard, the employer must provide training for each employee who uses personal fall protection systems or who is required to be trained as specified elsewhere in this subpart.***

(2) The employer must ensure that each employee is trained by a qualified person.

(3) The employer must train each employee in at least the following topics:

(i) The nature of the fall hazards in the work area and how to recognize them;

(ii) The procedures to be followed to minimize those hazards;

(iii) The correct procedures for installing, inspecting, operating, maintaining, and disassembling the personal fall protection systems that the employee uses; and

(iv) The correct use of personal fall protection systems and equipment specified in paragraph (a)(1) of this section, including, but not limited to, proper hook-up, anchoring, and tie-off techniques, and methods of equipment inspection and storage, as specified by the manufacturer.

(b) Equipment hazards.

***

(3) The employer must train each employee who uses a rope descent system in proper rigging and use of the equipment in accordance with § 1910.27.

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

The Cirque du Soleil defendants violated the aforementioned safety codes because on the day of the incident, plaintiff Konfektova, who had not been provided adequate training with respect to personal fall protection systems, was performing her activities on a walking-working surface more than fifteen feet (15') above a lower level, without being protected from falling by means of a safety net system or personal fall protection system.

g) **OAR 437-003-0503 Training requirements (Div 3 Sub M).**

(1) Training Program.

(a) The employer shall provide a training program for each employee who might be exposed to fall hazards. The program shall enable each employee to recognize the hazards of falling and shall train each employee in the procedures to be followed in order to minimize these hazards.

(b) The employer shall assure that each employee has been trained, as necessary, by a competent person qualified in the following areas:

(A) The nature of fall hazards in the work area;

(B) The correct procedures for erecting, maintaining, disassembling, and inspecting the fall protection systems to be used;

(C) The use and operation of guardrail systems, personal fall arrest systems, safety net systems, warning line systems, safety monitoring systems, personal fall restraint systems, positioning devices, and other appropriate protection to be used;

(D) The role of each employee in the safety monitoring system when this system is used;

(E) The limitations on the use of mechanical equipment during the performance of roofing work;

(F) The correct procedures for the handling and storage of equipment and materials and the erection of overhead protection; and

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

(G) The role of employees in the fall protection work plan;

(H) The standards contained in this subpart.

The Cirque du Soleil defendants violated the aforementioned safety codes by failing to provide any or adequate training and instructions to workers in the recognition and avoidance of unsafe conditions, *i.e.*, that fall protection systems needed to be utilized when working at elevated heights of fifteen feet (15') or more.

h) **OAR 437-001-0765 Safety Committees and Safety Meetings**

* * *

(10) Safety meetings must:

- Include all available employees.
- Include at least one employer representative authorized to ensure correction of safety and health issues.
- Be held on company time and attendees paid at their regular rate of pay.

* * *

(12) Safety meetings must include discussions of: Safety and health issues Accident investigations, causes, and the suggested corrective measures.

(13) Employers in construction, utility work, and manufacturing must document, make available to all employees, and keep for three years a written record of each meeting that includes the following:

- Hazards related to tools, equipment, work environment, and unsafe work practices identified and discussed during the meeting.
- The date of the meeting.
- The names of those attending the meeting.

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

The Cirque du Soleil defendants violated these safety rules by failing to hold regular safety meetings addressing potentials hazards, such as the danger of falling from fifteen feet (15') or more without proper fall protection or fall arrest systems, and by failing to document those safety meetings that should have been held.

i) **OAR 437-001-0053 – Preserving Physical Evidence at the Scene of an Accident**

(1) Employers, their representatives, or others shall not disturb the scene of a fatality or catastrophe other than to conduct the rescue of injured persons or mitigate an imminent danger until authorized by the Administrator (or designee), or directed by a recognized law enforcement agency.

The Cirque du Soleil defendants violated the aforementioned safety code by failing to preserve physical evidence at the scene of an accident.

j) **OAR 437-002-0022 Additional Oregon General Requirements**

***

(4) Aisles, Passageways, Walkways, Inclines. The employer must ensure:

***

(d) An adequate antislip surface is applied to inclined walkways whenever the gradient so warrants.

The Cirque du Soleil defendants violated the aforementioned safety code by failing to provide plaintiff with an adequate antislip working surface, which was warranted by the gradient plaintiff was working on.

k) **OAR 437-002-2027 Rope Descent & Rope Access Systems**

(1) Scope and application. This rule establishes safety requirements for rope descent and rope access. Rope descent and rope access systems can provide a safe way for employees to reach hard-to-reach locations, either natural or man-made. The requirements of this rule include, but are not limited to, the cleaning of buildings or structures, the inspection of dams and spillways, access to interior or exterior structural and architectural components of buildings, highway/bridge inspection and maintenance, power-plant penstocks and other difficult access areas.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

(2) Definitions. For the purposes of this rule the following definitions apply:

(a) Access is the means of reaching a workspace of a work area.

(b) Rope access means the use of rope access equipment where two ropes are used; one as the primary means of support and a second for fall arrest protection. The employee accesses the work area by ascending, descending, or traversing along both ropes by alternating connections and weight between the two ropes. Rope access may also be called industrial rope access but is not limited to industrial applications.

(c) Rope descent system means a suspension system that allows an employee to descend in a controlled manner and, as needed, stop at any point during the descent. A rope descent system usually consists of a roof anchorage, support rope, a descent device, carabiner(s) or shackle(s), and a chair (seatboard). A rope descent system also is called controlled descent equipment or apparatus. Rope descent systems do not include industrial rope access systems.

(3) Personal Protective Equipment. The employer must ensure personal protective equipment is in accordance with Division 2/I when rope descent systems or rope access methods are used.

***

(5) Rope descent systems. The employer must ensure:

***

(b) The rope descent system is used in accordance with instructions, warnings, and design limitations set by the manufacturer or under the direction of a qualified person;

(c) Each employee who uses the rope descent system is trained in accordance with 1910.30;

(d) The rope descent system is inspected at the start of each workshift that it is to be used. The employer must ensure damaged or defective equipment is removed from service immediately and replaced;

(e) The rope descent system has proper rigging, including anchorages and tiebacks, with particular emphasis on providing tiebacks when counterweights, cornice hooks, or similar non-permanent anchorages are used;



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

(f) Each employee uses a separate, independent personal fall arrest system that meets the requirements of 1910.140 in Division 2, Subdivision I;\

(g) All components of each rope descent system, except seat boards, are capable of sustaining a minimum rated load of 5,000 pounds (22.2 kN). Seat boards must be capable of supporting a live load of 300 pounds (136 kg);

***

(q) A pre-work briefing is conducted with each employee involved in rope descent to include, but is not limited to:

(A) The objective(s) of the work to be performed.

(B) Site-specific hazards.

(C) Environmental conditions that could affect the safety of the employee using the system.

(D) Emergency procedures to be followed (e.g., employee rescue).

The Cirque du Soleil defendants violated the aforementioned safety codes by failing to conduct an adequate, or any, pre-work briefings.

l) **OAR 437-002-0134. Personal Protective Equipment**

***

(1) Hazard assessment and equipment selection.

(a) The employer must assess the workplace to determine if hazards are present, or are likely to be present, which necessitate the use of personal protective equipment (PPE) or other protective equipment. If such hazards are present, or likely to be present, the employer must:

(A) Select, and have each affected employee use, the types of PPE that will protect the affected employee from the hazards identified in the hazard assessment;

(i) All protective equipment must be of safe design and construction for the work to be performed.

(ii) Protective equipment must be worn and used in a manner which will make full use of its protective properties.



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

(B) Communicate selection decisions to each affected employee; and

(C) Select PPE that properly fits each affected employee.

***

(2) Equipment.

***

(c) Defective or damaged personal protective equipment must not be used.

(d) Each employer must maintain a regular system of inspection and maintenance of personal protective equipment furnished to workers.

***

(6) Work Clothing.

(a) Clothing must be worn which is appropriate to the work performed and conditions encountered.

The Cirque du Soleil defendants violated the aforementioned safety codes because on the day of the incident, plaintiff Konfektova was performing her work activity without a fall arrest system, or any other form of personal protective equipment, thereby allowing her to fall approximately fifteen feet (15') to a lower level;

m) **29 C.F.R. § 1926.451 General Requirements.**

***

(g) Fall Protection.

(1) Each employee on a scaffold more than 10 feet (3.1 m) above a lower level shall be protected from falling to that lower level. ***

(i) Each employee on a boatswains' chair, catenary scaffold, float scaffold, needle beam scaffold, or ladder jack scaffold shall be protected by a personal fall arrest system;



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

> (ii) Each employee on a single-point or two-point adjustable suspension scaffold shall be protected by both a personal fall arrest system and guardrail system.

The Cirque du Soleil defendants violated the aforementioned safety codes because on the day of the incident, plaintiff Konfektova was performing her work activity without a fall arrest system, or any other form of personal protective equipment, thereby allowing her to fall approximately fifteen feet (15') to a lower level.

78.

As a result of one or more of the violations of the ELL by the Cirque du Soleil defendants, as set forth above, plaintiff suffered injuries, underwent medical procedures, and is entitled to compensatory damages on Count Three as set forth in ¶¶33 through 38 of Count One.

**COUNT FOUR**
**(Negligence *Per Se*)**
**(Oregon Safe Employment Act)**

79.

Plaintiff realleges and incorporates herein ¶¶1 through 67 of Count One, ¶¶69 through 73 of Count Two, and ¶¶76 and 77 of Count Three.

80.

At all material times, the Cirque du Soleil defendants were employers in charge of, and responsible for, work involving risk or danger to plaintiff. The premises located at the Portland Expo Center, 2060 N. Marine Drive, city of Portland, county of Multnomah, state of Oregon, were a "place of employment" as defined in ORS 654.005(8), part of the Oregon Safe Employment Act ("OSEA"). The premises were a fixed or movable place where an employee worked temporarily or permanently, and where a process, operation, or activity took place related, either directly or indirectly, to an employer's industry, trade, business or occupation.

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

81.

The Cirque du Soleil defendants were the owners, as that term is defined in ORS 654.005(6), in that they had ownership, control, and/or custody of the premises located at 2060 N. Marine Drive, city of Portland, county of Multnomah, state of Oregon, where plaintiff was injured. The Cirque du Soleil defendants were employers, as that term is defined in ORS 654.005(5), in that they had one or more employees.

82.

By violating one or more of the safety codes set forth in ¶77, The Cirque du Soleil defendants failed to comply with every requirement of every order, decision, direction, standard, rule or regulation made or prescribed by the Department of Consumer and Business Services in connection with the matters specified in ORS 654.001 to 654.295 and 654.750 to 654.780, or in any way relating to or affecting safety and health in places of employment, and failed to do everything necessary or proper in order to secure compliance with and observance of every such order, decision, direction, standard, rule or regulation, as required by ORS 654.022.

83.

As a result of one or more of the violations of the OSEA by the Cirque du Soleil defendants, as set forth above, plaintiff, a member of the class of persons the OSEA was meant to protect, suffered injuries of a type the OSEA was enacted to prevent, underwent medical procedures, and is entitled to compensatory damages on Count Four as previously alleged in ¶¶33 through 38 of Count One.

///

///

///

///

///

///



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628

WHEREFORE plaintiff prays for judgment against the Cirque du Soleil defendants in the sum of $16,750,000.00; for pre-judgment interest at the legal rate of 9% per annum for plaintiff's economically verifiable losses from the date of loss to the date of entry of judgment; for her costs and disbursements incurred herein; and for such other relief as the court deems just and equitable.

DATED this 20th day of August, 2026.

J. Randolph Pickett, OSB #721974
randy@pdm.legal
Kimberly O. Weingart, OSB #091407
kim@pdm.legal
Samantha N. Stanfill, OSB #234143
samantha@pdw.legal
Mayra A. Ledesma, OSB #183942
mayra@pdm.legal
Juliana J. Minn, OSB #195746
juliana@pdm.legal
Hannah J. Schilling, OSB#234095
hannah@pdw.legal
PICKETT DUMMIGAN WEINGART LLP

of Attorneys for Plaintiff



**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
(503) 226-3628